1   TINA WOLFSON (SBN 174806)
    *twolfson@ahdootwolfson.com*
2   ROBERT AHDOOT (SBN 172098)
    *rahdoot@ahdootwolfson.com*
3   THEODORE MAYA (SBN 223242)
    *tmaya@ahdootwolfson.com*
4   **AHDOOT & WOLFSON, PC**
5   2600 W. Olive Avenue, Suite 500
    Burbank, CA 91505-4521
6   Tel: 310.474.911; Fax: 310.474.8585

7   BEN BARNOW (*pro hac vice*)
    *b.barnow@barnowlaw.com*
8   ANTHONY L. PARKHILL (*pro hac vice*)
    *aparkhill@barnowlaw.com*
9   **BARNOW AND ASSOCIATES, P.C.**
    205 West Randolph Street, Suite 1630
10  Chicago, IL 60606
    Telephone: 312.621.2000
11

12  *Attorneys for Plaintiffs and the Proposed Class*

13  [additional counsel on signature page]

14              **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
15

16  RICKY COCHRAN, ALAIN BERREBI, and          Case No. 5:21-cv-01887-EJD
    JARAMEY STOBBE, individually and on
17  behalf of all others similarly situated,    **PLAINTIFFS' NOTICE OF MOTION
                                                AND MOTION FOR PRELIMINARY
18                          Plaintiffs,         APPROVAL OF CLASS ACTION
                                                SETTLEMENT; MEMORANDUM OF
19          v.                                  POINTS AND AUTHORITIES IN
                                                SUPPORT THEREOF
20  THE KROGER CO. and ACCELLION, INC.,
                                                DATE:      September 16, 2021
21                          Defendants.         TIME:      9:00 A.M.
                                                JUDGE:     Hon. Edward J. Davila
22                                              CTRM:      4, 5th Floor
23
                                                [Declarations of Cameron Azari, Ben
24                                              Barnow, Robert Siciliano, and Tina Wolfson
                                                filed concurrently herewith]
25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

4          PLEASE TAKE NOTICE that on September 16, 2021, at 9:00 a.m., in Courtroom 4 of the

5 United States District Court for the Northern District of California, Robert F. Peckham Federal

6 Building & United States Courthouse, 280 South 1st Street, San Jose, 95113, the Honorable Edward

7 J. Davila presiding, Plaintiffs Ricky Cochran, Alain Berrebi, and Jaramey Stobbe, will and hereby

8 do move for an Order for Preliminary Approval of Class Action Settlement.

9          This motion is based upon this Notice of Motion and Motion, the supporting Memorandum

10 set forth below, and the exhibits attached hereto, the pleadings and records on file in this Action,

11 and other such matters and argument as the Court may consider at the hearing of this motion.

12                                    Respectfully submitted,

13 Dated:  June 30, 2021                By:  _/s/ Tina Wolfson_____
                                            TINA WOLFSON (SBN 174806)
14                                          *twolfson@ahdootwolfson.com*
                                            ROBERT AHDOOT (SBN 172098)
15                                          *rahdoot@ahdootwolfson.com*
                                            THEODORE MAYA (SBN 223242)
16                                          *tmaya@ahdootwolfson.com*
                                            **AHDOOT & WOLFSON, PC**
17                                          2600 W. Olive Avenue, Suite 500
                                            Burbank, CA 91505-4521
18                                          Tel:  310.474.9111; Fax:  310.474.8585

19
                                            BEN BARNOW (*pro hac vice*)
20                                          *b.barnow@barnowlaw.com*
                                            ANTHONY L. PARKHILL (*pro hac vice*)
21                                          *aparkhill@barnowlaw.com*
                                            **BARNOW AND ASSOCIATES, P.C.**
22                                          205 West Randolph Street, Suite 1630
                                            Chicago, IL 60602
23                                          Tel: 312-621-2000; Fax: 312-641-5504

24
                                            ANDREW W. FERICH (*pro hac vice*)
25                                          *aferich@ahdootwolfson.com*
                                            **AHDOOT & WOLFSON, PC**
26                                          201 King of Prussia Road, Suite 650
                                            Radnor, PA 19087
27                                          Tel:  310.474.9111; Fax: 310.474.8585

28                                          *Attorneys for Plaintiffs and the Proposed Class*

- 1 -

# <u>TABLE OF CONTENTS</u>

**Page**

I.   STATEMENT OF THE ISSUES TO DECIDED ..................................................... 1

II.  INTRODUCTION ................................................................................................. 1

III. BACKGROUND ................................................................................................... 2

    A.   The FTA Data Breach and Subsequent Litigation ..................................... 2

    B.   Mediation and Settlement Negotiations ..................................................... 6

IV.  TERMS OF THE SETTLEMENT ........................................................................ 8

    A.   The Class Definition .................................................................................. 8

    B.   The Release ................................................................................................ 8

    C.   The Settlement Benefits ............................................................................ 8

        1.   Cash Fund Payments ......................................................................... 9

        2.   Credit Monitoring and Insurance Services........................................ 9

        3.   Documented Loss Payment .............................................................. 10

        4.   Prospective Relief and Changes in Business Practices Attributable to the Settlement........................................................................................ 10

        5.   The Settlement's Value to Settlement Class Members ............................11

    D.   Plan of Distribution ................................................................................. 11

    E.   Residual....................................................................................................12

    F.   Notice to Class ......................................................................................... 12

    G.   Proposed Class Representative Service Awards........................................ 13

    H.   Attorneys' Fees and Expenses ................................................................. 13

    I.   The Settlement Administrator .................................................................. 14

V.   PRELIMINARY APPROVAL IS APPROPRIATE........................................... 15

    A.   The Rule 23 Requirements for Class Certification are Met...................... 15

        1.   Rule 23(a) Is Satisfied..................................................................... 15

            i.   The Class Is Sufficiently Numerous .............................. 15

            ii.   There Are Common Questions of Law and Fact ........................ 15

i

1

        iii.     The Class Representatives' Claims Are Typical .......................... 16

2

        iv.     Class Representatives and Proposed Class Counsel Adequately

3

                   Represent Class Members ...................................................... 16

4

    2.    Rule 23(b)(3) is Satisfied .......................................................... 17

5

        i.      Common Issues of Law and Fact Predominate Over Any Potential

6

                   Individual Questions ................................................................. 17

7

        ii.     A Class Action is the Superior Method to Fairly and Efficiently

8

                   Adjudicate the Matter ................................................................ 18

9

  B.    The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class

10

    Members, and Should be Preliminarily Approved ................................................ 19

11

    1.    The Strength of Plaintiffs' Case and Possible Monetary Remedies ........ 21

12

    2.    The Risk, Expense, Complexity, and Potential Class Recovery .............. 22

13

    3.    The Risk of Maintaining Class Status Through Trial .............................. 25

14

    4.    The Amount Offered in Settlement Is Fair ................................................ 25

15

    5.    The Proposed Method of Distribution Is Highly Effective ...................... 27

16

    6.    The Extent of Discovery Completed and the Stage of the Proceedings ... 28

17

    7.    The Experience and Views of Counsel ...................................................... 29

18

    8.    The Presence of a Governmental Participant ............................................ 30

19

    9.    The Reaction of Class Members to the Proposed Settlement ................... 30

20

    10.   The Settlement Is the Product of Arm's-Length Negotiations that Were

21

        Free of Collusion ....................................................................................... 30

22

    11.   The Proposed Notice Plan is Appropriate ................................................. 32

23

    12.   Appointment of Settlement Class Counsel ............................................... 34

24

    13.   Settlement Deadlines and Schedule for Final Approval .......................... 34

25

VI.   CONCLUSION ................................................................................................... 35

26

27

28

1

2

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

3

## CASES

4

5

*Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*,
  2018 WL 8949777 (N.D. Cal. Oct. 15, 2018) ........................................................................ 17

6

*Alvarez v. Sirius XM Radio Inc.*,
  2020 WL 7314793 (C.D. Cal. July 15, 2020) ........................................................................ 17

7

8

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591, 117 S.Ct. 2231 (1997) ........................................................................ 14, 15, 18

9

10

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) ........................................................................................ 26

11

12

*Corcoran et al. v. CVS Health Corporation*,
  No. 4:15-CV-03504 (N.D. Cal. June 24, 2021) ........................................................................ 21

13

*Eisenhower Medical Center v. Superior Court (Malanche)*,
  2014 WL 2115216 (Cal. Ct. App. May 21, 2014) ................................................................... 23

14

15

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................................ 16

16

17

*G. F. v. Contra Costa Cnty.*,
  2015 WL 4606078 (N.D. Cal. July 30, 2015) ........................................................................ 31

18

19

*Hammond v. The Bank of N.Y. Mellon Corp.*,
  2010 WL 2643307 (S.D.N.Y. June 25, 2010) ........................................................................ 22

20

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. 2018) .................................................................................... 18, 20

21

22

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) .................................................................................... 20, 30, 31

23

24

*In re Emulex Corp. Sec. Litig.*,
  210 F.R.D. 717 (C.D. Cal. 2002) .................................................................................... 17

25

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ........................................................................ 22

26

27

*In re Experian Data Breach Litigation*,
  No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019) ........................................................ 19

28

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  2019 WL 3410382 (D. Or. July 29, 2019) ............................................................................ 31

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) ................................................................................ 33

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   2017 WL 2178306 (D. Minn. May 17, 2017) .......................................................... 25

*In re The Home Depot, Inc. Customer Data Sec. Breach Litig.*,
   2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) .......................................................... 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   895 F.3d 597 (9th Cir. 2018) ................................................................................... 16

*In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*,
   No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019) ............................................... 19

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ................................................................................. 19

*Kent v. Hewlett-Packard Co.*,
   2011 WL 4403717 (N.D. Cal. Sept. 20, 2011) ........................................................ 16

*Krottner v. Starbucks Corp.*,
   406 Fed.Appx. 129 (9th Cir. 2010) .......................................................................... 22

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ................................................................................... 15

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ................................................................................................. 32

*Phillips Co. v. Shutts*,
   472 U.S. 797 (1985) ................................................................................................. 18

*Pruchnicki v. Envision Healthcare Corp.*,
   845 F. App'x 613 (9th Cir. 2021) ............................................................................ 22

*Rahman v. Marriott Int'l, Inc.*,
   2021 WL 346421 (C.D. Cal. Jan. 12, 2021) ............................................................ 24

*Regents of University of California v. Superior Court*,
   220 Cal. App. 4th 549 (2013) .................................................................................. 23

*Sandoval v. Roadlink USA Pac., Inc.*,
   2011 WL 5443777 (C.D. Cal. Oct. 9, 2011) ............................................................ 15

*Sutter Health v. Superior Ct.*,
   227 Cal. App. 4th 1546 (2014) ................................................................................ 23

iv

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ........................................................................................... 18

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) ............................................................................... 13

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ............................................................................................... 15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir.) ............................................................................................. 32

*Warner v. Toyota Motor Sales, U.S.A., Inc.,*
    2016 WL 8578913 (C.D. Cal. Dec. 2, 2016)......................................................... 32

*Wershba v. Apple Computer, Inc.,*
    91 Cal.App.4th 224 (2001)..................................................................................... 32

*Wright v. Linkus Enters., Inc.,*
    259 F.R.D. 468 (E.D. Cal. 2009)........................................................................... 20

**CODES**

28 U.S.C. § 1407 ............................................................................................................. 5
28 U.S.C. § 1715 ........................................................................................................... 30
Cal. Civ. Code § 1798.145(c)(1)(A)-(B)...................................................................... 24
Cal. Civ. Code § 1798.150(a)(1)................................................................................... 24

**RULES**

Fed. R. Civ. P. 23 ................................................................................................... 14, 15
Fed. R. Civ. P. 23(b) ..................................................................................................... 15
Fed. R. Civ. P. 23(b)(3)........................................................................................... 17, 18
Fed. R. Civ. P. 23(c)(2)(B)....................................................................................... 32, 33
Fed. R. Civ. P. 23(e).................................................................................................*passim*
Fed. R. Civ. P. 23(e)(2) ............................................................................................ 2, 20
Fed. R. Civ. P. 23(e)(2)(C)(ii)...................................................................................... 27
Fed. R. Civ. P. 23(g)(1)(A)(i-iv).................................................................................. 34
Fed. R. Civ. P. 23(g)(1)(B)........................................................................................... 33

**OTHER AUTHORITIES**

4 Newberg on Class Actions § 11:53 (4th ed. 2013) .................................................... 32

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   STATEMENT OF THE ISSUES TO DECIDED

Whether the proposed Settlement warrants: (a) preliminary approval; (b) certification of a Settlement Class; (c) dissemination of Notice to the Settlement Class Members ("Class Members") of the Settlement's terms in the proposed method using the proposed forms; (d) appointment of Ahdoot & Wolfson, PC, and Barnow and Associates, P.C. as Class Counsel and of Plaintiffs Ricky Cochran, Alain Berrebi, and Jaramey Stobbe as Class Representatives; and (e) setting a Fairness Hearing for final approval of the Settlement and a hearing to consider any application for attorneys' fees, Service Awards, and reimbursement of expenses.

## II.   INTRODUCTION

Plaintiffs Ricky Cochran, Alain Berrebi, and Jaramey Stobbe request that the Court preliminarily approve a nationwide class action settlement ("Settlement") with Defendant, The Kroger Co. ("Kroger"), that would resolve all class claims against Kroger, only, on behalf of approximately 3.82 million Class Members relating to Accellion's File Transfer Appliance ("FTA") Data Breach (the "FTA Data Breach").[1]

The Settlement would establish a non-reversionary cash fund of $5 million to pay for valid claims, notice and administration costs, and incentive awards to the named Plaintiffs and any attorneys' fees and costs awarded by the Court. Claimants may elect to receive: (1) a cash payment, calculated in accordance with the terms of the Settlement Agreement (with double the amount to California residents because of the statutory claims available to them); (2) two years of Credit Monitoring and Insurance Services ("CMIS"); or (3) a payment for reimbursement of Documented Losses of up to $5,000. The Settlement also provides for robust injunctive relief which includes, *inter alia*, confirming that Class Members' sensitive personally identifiable information ("PII") is secured; dark web monitoring for five years for fraudulent activity relating to Class Members' PII; and various enhancements to Kroger's third-party vendor risk management program and other data

---

[1]   Unless otherwise noted, all capitalized terms not separately defined herein have the meaning ascribed to them in the Settlement Agreement filed concurrently herewith.

privacy enhancements.

The Settlement is the product of hard-fought, arms-length negotiations between experienced counsel after necessary discovery. The Hon. Judge Jay C. Gandhi (Ret.) of JAMS mediated this matter on May 13, 2021, and the parties spent numerous hours over the subsequent weeks negotiating and finalizing the Settlement details.

The Settlement resolves claims against Kroger only and, if approved, would release claims in: *Jones v. The Kroger Co.*, No. 1:21-cv-00146 (S.D. Ohio), *Govaert et al. v. The Kroger Co.*, No. 1:21-cv-00174 (S.D. Ohio), *Doty et al. v. The Kroger Co.*, No. 1:21-cv-00198 (S.D. Ohio), *Strohm v. The Kroger Co.*, No. 1:21-cv-00226 (S.D. Ohio), *Abrams et al. v. The Kroger Co.*, No. 1:21-cv-00240 (S.D. Ohio), *Buck v. The Kroger Co.*, 1:21-cv-00279 (S.D. Ohio), and *Baer v. The Kroger Co.*, No. 1:21-cv-00323 (S.D. Ohio) (collectively, the "Ohio Actions"; *see, infra*, Sec. III.A.); and *Martin v. Kroger Co.*, No. 1:21-cv-00717-JRS-DML (S.D. Ind.) (*pro se* plaintiff) ("*Martin*").

The Settlement delivers tangible and immediate benefits to the Settlement Class that address all the potential harms of the data breach suffered by Class Members without protracted class action litigation including multiple parties and serious inherent risks. It delivers a fair, adequate, and reasonable resolution for the Class and merits approval. Fed. R. Civ. P. 23(e)(2).

## III.   BACKGROUND

### A.   The FTA Data Breach and Subsequent Litigation

In late 2020 and early 2021, Accellion began disclosing to its clients that certain threat actors had breached Accellion client data via vulnerabilities in Accellion's File Transfer Appliance ("FTA") software. First Amended Complaint ("FAC"), ECF No. 27, ¶ 2. These threat actors were then able to steal sensitive data from many Accellion clients, including corporations, law firms, banks, universities, and other entities. *Id.* ¶ 31. On January 23, 2021, Accellion notified Kroger that it was one such client impacted by the FTA Data Breach. *Id.* ¶ 42. As part of the FTA Data Breach, hacker(s) accessed Kroger's files containing Plaintiffs' and Class Members' PII. *Id.*

On February 19, 2021, Kroger publicly confirmed that the PII of certain Kroger pharmacy customers and former and current employees was compromised in the Data Breach. *Id.* ¶ 5. The

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

affected PII included names, email addresses, dates of birth, home addresses, phone numbers, social security numbers, salary information, health benefits information including prescription ID numbers, and prescription information. *Id.* ¶ 1. As a result of the breach, unauthorized persons accessed sensitive PII of approximately 3.82 million Kroger pharmacy customers and current and former employees. Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 36.

On March 17, 2021, this action was filed on behalf of Plaintiffs Ricky Cochran and Alain Berrebi, naming Accellion and Kroger as co-defendants. ECF No. 1. Plaintiffs filed the FAC on June 25, 2021. ECF No. 27.[2] Each of the Plaintiffs received notification from Kroger indicating that their PII was accessed during the FTA Data Breach. *Id.* ¶ 9.

Plaintiffs allege that, *inter alia*, Kroger and Accellion: (a) failed to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' PII; (b) failed to prevent the FTA Data Breach; (c) failed to detect security vulnerabilities leading to the FTA Data Breach; and (d) failed to disclose that their data security practices were inadequate to safeguard Class Members' PII. ECF No. 27 ¶¶ 48, 54, 64-70, 113. With respect to Kroger, Plaintiffs alleged that it had a duty to, and impliedly promised Plaintiffs and Class Members that it would, protect their sensitive PII from unauthorized disclosure and handle this data securely, and that it failed to do so by entrusting the PII to a third-party file transfer vendor whose products and services were prone to security vulnerabilities that left Class Members' PII exposed. *Id.* ¶¶ 54, 89.

Plaintiffs' allegations include claims for negligence, breach of implied contract, violations of the California Consumer Privacy Act ("CCPA"), and violations of the California Confidentiality of Medical Information Act ("CMIA"). *Id.* ¶¶ 83-169. Plaintiffs seek certification of a nationwide class. ¶ 75.

Kroger has steadfastly denied all such allegations and responded to Plaintiffs' CCPA demand letter that it had cured any violation of the statute, sent notice to all impacted individuals

---

[2]   The FAC includes Plaintiff Jaramey Stobbe, a plaintiff in the separately filed class action in this Court against Accellion only, entitled *Stobbe v. Accellion, Inc.*, No. 5:21-cv-01353-EJD (filed February 24, 2021) ("*Stobbe*").

and offered two years of credit monitoring and ID theft insurance, reported the incident and work closely with the FBI, recovered the impacted data and received evidence that any remaining copies of the data were deleted, and confirmed that none of the impacted data was published or offered for sale on the dark web. Wolfson Decl. ¶ 12. Kroger discontinued its use of Accellion and FTA, reported the incident to law enforcement, and initiated its own investigation. *Id.* ¶ 29.

According to Kroger, Accellion never informed Kroger that the FTA product was insecure or ill-suited for its purpose of providing securing file transfers, but, rather, represented that the opposite is true. *Id.* ¶ 30. Prior to the disclosure of the FTA Data Breach, Kroger already had purchased from Accellion its next generation file transfer product, known as Kiteworks, and was on target to complete migration to this product, from the breached FTA product by March 2021. *Id.* ¶ 31. Accellion supported the FTA product platform utilized by Kroger up to the announcement of the FTA Data Breach. *Id.* ¶ 32. Accellion represented that the FTA product would remain licensed and supported during the transition to Kiteworks. *Id.* ¶ 33.

Following announcement of the FTA Data Breach, Kroger worked with Accellion to investigate. *Id.* ¶ 34. Separately, Accellion hired Mandiant, a U.S. based cyber security firm, to conduct a forensic analysis, and later posted its report on the Accellion website.[3] Kroger also reported the incident to the FBI and activated Verizon's Incident Response support team to analyze relevant information, review impacted data, and prepare notification to affected individuals. *Id.* ¶ 35.

Approximately 3,825,200 Kroger employees and customers were impacted by the FTA Data Breach. *Id.* ¶ 36. Of the total individuals impacted, approximately 2,458,800 were Kroger employees; 1,324,600 were Kroger customers; and 23,800 were both employees and customers of Kroger. In California approximately 150,000 individuals were impacted. *Id.*

---

[3]     ACCELLION, INC., FILE TRANSFER APPLIANCE (FTA) SECURITY ASSESSMENT, (2021), https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf.

According to Kroger, it learned of the FTA Data Breach on January 23, 2021, and on February 2, 2021, it received a ransom demand in exchange for a commitment not to disseminate Kroger's data. *Id.* ¶ 37. Kroger informed the FBI and paid the ransom on February 18, 2021. *Id.* The extortion entity returned the data the next day, along with a video purporting to show the deletion of Kroger's files. *Id.* While nothing stops the extortion entity on reneging on its commitments, Kroger reports that it continually has monitored the dark web to make certain that the data was not retained or disseminated. *Id.* ¶ 38. The Settlement ensures that this monitoring will continue for five years. SA ¶ 70.e.

Following commencement of this action, Plaintiffs and Kroger began a dialogue about case management issues and engaged in multiple meet-and-confer discussions. Wolfson Decl. ¶ 14; Barnow Decl. ¶ 14. Plaintiffs' counsel already had been engaging in efforts to coordinate all of the cases filed in this District relating to the FTA Data Breach, including drafting a stipulation to consolidate all of those cases and set deadlines for submitting leadership applications. Wolfson Decl. ¶ 14; Barnow Decl. ¶ 14. After this action was filed, Plaintiffs' counsel coordinated with Kroger's counsel to facilitate Kroger's inclusion in the stipulation. Wolfson Decl. ¶ 14; Barnow Decl. ¶ 14.

In view of the fact that many cases relating to the FTA Data Breach continued to be filed in multiple courts, two weeks after this action was commenced, on March 31, 2021, attorneys from Ahdoot & Wolfson, PC filed a motion for transfer and centralization pursuant to 28 U.S.C. § 1407 with the United States Judicial Panel on Multidistrict Litigation, seeking to transfer numerous FTA Data Breach-related actions in four district courts to this Court for centralized proceedings. *In re Accellion, Inc., Data Breach Litigation*, MDL No. 3002 (J.P.M.L. 2021), at ECF No. 1 ("JPML Motion").

During the pendency of the JPML Motion, dialogue between counsel for Plaintiffs and Kroger continued. Some of the plaintiffs' counsel in the Ohio Actions who also had cases against Accellion pending before this Court did not join the consolidation stipulation. Wolfson Decl. ¶ 15; Barnow Decl. ¶ 14. On April 9, 2021, Plaintiffs and Kroger submitted a stipulation in this action

- 5 -

extending Kroger's time to respond to the Complaint to the earlier of 45 days following a decision on the JPML Motion, or 45 days after Kroger answers or otherwise responds to a complaint in any of the other FTA Data Breach actions. ECF No. 14. On June 7, 2021, the Panel issued an order denying transfer. MDL No. 3002, ECF No. 88.

As stated above, this Settlement would resolve all claims in the Ohio Actions and in *Martin*. On April 20, 2021, the attorneys in the Ohio Actions filed a motion to consolidate six of those matters. *Jones*, ECF No. 14. On June 3, 2021, the attorneys in the Ohio Actions filed a motion, pursuant to Rule 23(g), seeking to appoint a 10-firm leadership structure. *Jones*, ECF No. 20-1. One day after Kroger sought to stay or extend certain deadlines in the Ohio Actions on the grounds that it had entered into this Settlement Agreement, among other reasons (*Jones*, ECF No. 21), the Ohio District Court (i) granted the unopposed Motion to Consolidate, but (ii) ruled that Kroger's "motion for extension of time to answer is DENIED as moot, given Plaintiff will be filing a consolidated complaint. Plaintiffs' motion to appoint interim class counsel (Doc. [20]) and Defendant's [Kroger] motion to stay (Doc. [21]) remain pending until briefing is concluded." *Jones*, Text Order, June 22, 2021. The *pro se* plaintiff in *Martin*, as of the filing of this Motion, has filed a number of amended complaints in response to the Court's *sua sponte* orders regarding defective jurisdictional allegations. Wolfson Decl. ¶ 16.

**B. Mediation and Settlement Negotiations**

As a result of their continued meet-and-confer efforts, the Parties were able to reach an agreement to participate in mediation to attempt to resolve this matter. Wolfson Decl. ¶ 17; Barnow Decl. ¶ 17. The mediation took place on May 13, 2021 before the Hon. Judge Jay C. Gandhi (Ret.) of JAMS. Wolfson Decl. ¶ 17; Barnow Decl. ¶ 17.

Prior to the mediation session, the Parties voluntarily exchanged information to prepare for and facilitate a productive mediation session. Wolfson Decl. ¶ 18; Barnow Decl. ¶ 18. The Parties communicated their respective positions on the litigation and the Parties' claims and defenses with each other and the mediator. Wolfson Decl. ¶ 18; Barnow Decl. ¶ 18. Plaintiffs received and analyzed data from Kroger relating to the impact of the FTA Data Breach on Kroger, including

- 6 -

specific information concerning the categories of individuals who received breach notification letters from Kroger (e.g., customers, employees), the nature of the PII impacted, and the number of Class Members impacted. Wolfson Decl. ¶ 18; Barnow Decl. ¶ 18.

On May 13, 2021 the Parties participated in a full-day mediation session with Judge Gandhi by video conference. Wolfson Decl. ¶ 19; Barnow Decl. ¶ 19. With Judge Gandhi's guidance, the Parties had a productive mediation session with both sides zealously represented by experienced counsel. Late in the day, the Parties reached an agreement in principle to settle the litigation. Wolfson Decl. ¶ 19; Barnow Decl. ¶ 19.

Following the mediation, the Parties continued to work together to finalize the Settlement's terms. Wolfson Decl. ¶ 21; Barnow Decl. ¶ 21. During this time, the Parties exchanged numerous drafts of the Settlement Agreement and its exhibits and negotiated numerous details to maximize the benefits to the Class Members. Wolfson Decl. ¶ 21; Barnow Decl. ¶ 21.

Counsel solicited competing bids and negotiated with four separate third-party administrators for settlement notice and administration. Wolfson Decl. ¶ 23; Barnow Decl. ¶ 22. Counsel ultimately negotiated an agreement with Epiq Class Action and Mass Tort Solutions, LLC ("Epiq"), which estimates that the total administration and notice charges in this matter will be approximately $740,948 to $827,299. *Id*. This estimate is reasonable in the context of this proposed Settlement, and includes all costs associated with providing direct notice, class member data management, CAFA notification, telephone support, claims administration, creation and management of the Settlement Website, disbursements and tax reporting, and includes postage (which is estimated to be approximately $320,000 to $350,000). *Id*. Plaintiffs' counsel also solicited competing bids from alternative providers of CMIS. Barnow Decl. ¶ 27. Ultimately, counsel negotiated for Experian to provide the CMIS. *Id*. ¶ 27 (for details of the features of the CMIS).

During the Settlement negotiations process, the Parties deferred any discussion concerning the maximum Service Awards to be sought by the proposed Class Representatives until after reaching an agreement on all material terms of the Settlement. Wolfson Decl. ¶ 22; Barnow Decl. ¶ 37. There has been no negotiation and no agreement as to the amount of attorneys' fees and

- 7 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

expenses to be sought by proposed Class Counsel. *See, e.g.,* SA ¶ 99. Negotiations regarding the Settlement have been conducted at arm's length, in good faith, free of any collusion, and under the supervision of Judge Gandhi. Wolfson Decl. ¶ 42; Barnow Decl. ¶ 33.

After comprehensive negotiations and diligent efforts, Plaintiffs and Kroger finalized the terms of the Settlement, and seek preliminary approval of the Settlement from the Court.

## IV.   TERMS OF THE SETTLEMENT

### A.   The Class Definition

The proposed Settlement Class is defined as follows:

> [A]ll residents of the United States who were notified by The Kroger Co. that their PII was compromised as a result of the FTA Data Breach. Excluded from the Settlement Class are: (1) the Judges presiding over the Action, and members of their families; (2) the Defendant Kroger, their subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant Kroger or their parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

SA ¶ 44. The proposed Settlement Class is identical to the Nationwide Class defined in the FAC. ECF No. 27 ¶ 75.

### B.   The Release

In exchange for the benefits provided under the Settlement Agreement, Class Members will release any claims against Kroger related to or arising from any of the facts alleged in the FAC filed in this litigation. SA ¶ 57. Class Members do not release any claims they may have against other defendants related to the FTA Data Breach. The claims sought to be released by the Settlement are coextensive with the claims in the FAC.

### C.   The Settlement Benefits

The Settlement provides for a $5 million non-reversionary Settlement Fund (*id.* ¶ 60) that will be used to provide Participating Class Members, at their choice, with one of the following Settlement Benefits:

- 8 -

### 1. Cash Fund Payments

Participating Class Members may submit a claim to receive a cash Settlement Payment ("Cash Fund Payment"). The amount of the Cash Fund Payment will be calculated in accordance with the terms of the Settlement Agreement. *Id.* ¶ 71(b); *see also, infra*, Sec. V.D. In view of the heightened protections afforded to California Class Members under the California statutory claims asserted in this lawsuit (i.e., the CCPA, CMIA), California Class Members who submit valid claims for Cash Fund Payments will receive Settlement Payments that are twice the amount of Settlement Payments made to non-California Class Members. SA ¶ 76(b).

It is difficult to estimate the amount of the Cash Fund Payment as it will depend on a number of factors. Assuming, however, that the claims rate here is 1% to 3% (Declaration of Cameron R. Azari (Settlement Administrator) ("Azari Decl."), ¶ 27; *see also, infra*, Sec. V.B.5, previous Data Breach Settlement claims rate chart, Class Counsel estimate that California Claimants will receive approximately $182 at 1%, $74 at 2%, and $36 at 3%, and non-California Claimants will receive approximately $91 at 1%, $37 at 2%, and $18 at 3%. Wolfson Decl. ¶ 26.

### 2. Credit Monitoring and Insurance Services

Each Participating Settlement Class Member who submits a valid claim alternatively may elect to receive CMIS. The CMIS protection plan will be provided by Experian and is referred to as the "IdentityWorks Credit 3-Bureau Plan." Barnow Decl. ¶ 27. If a Participating Settlement Class Member chooses the CMIS as her respective Settlement Benefit and already maintains a subscription for a similar product, they will have the option to postpone the commencement of the CMIS by 12 months for no additional charge. SA ¶ 71.a.

The CMIS protection plan will include the following services: (i) up to $1 million dollars of identity theft insurance coverage; (ii) three-bureau credit monitoring providing notice of changes to the participant's credit profile; (iii) alerts for activity including new inquiries, new accounts created, change of address requests, changes to public records, postings of potentially negative information, and other leading indicators of identity theft; (iv) customer care and dedicated fraud resolution agent; (v) comprehensive educational resources; and (vi) extended fraud resolution. *Id.*;

Barnow Decl. ¶ 27. The retail value of this CMIS is $15 per month (a total $360 for the entire two-year term) for each subscriber. Declaration of Robert Siciliano ("Siciliano Decl.") ¶¶ 7-8.

### 3. Documented Loss Payment

In the alternative to the CMIS or the Cash Fund Payment, Class Members may seek reimbursement of up to $5,000 of Documented Losses ("Document Loss Payment"). To receive a Documented Loss Payment, a Settlement Class Member must submit a valid Claim Form with attestation regarding the amount of the loss supported by reasonable documentary proof. SA ¶ 71.c.

### 4. Prospective Relief and Changes in Business Practices Attributable to the Settlement

The Settlement also promises significant remedial measures that Kroger has agreed to implement as a result of this litigation, all of which will benefit all Class Members, whether or not they submit a claim. Kroger will confirm that it has fully ended its use of the Accellion FTA and migrated to a new secure file transfer solution. SA ¶ 70. It will undertake measures to secure, or securely destroy, the PII that was subject to and subsequently recovered in the FTA Data Breach, and confirm that this has been completed. *Id.* Kroger also will:

> "enhance its existing third-party vendor risk management program … by taking at least the following measures: (i) [c]onduct periodic reviews of all file transfer programs or software currently being utilized for individual-to-individual transfers by … Kroger, including any third-party products, and evaluate whether any software used for such purpose is known by Kroger to be outdated, unsupported, or unsecure; (ii) [t]o the extent Kroger changes its third-party file transfer vendor in the next five years, implement an RFP or bid solicitation program for third-party file transfer vendors; (iii) [f]or a period of five (5) years following the date the Court approves of the Settlement Agreement, continue to maintain positions within Kroger that are specifically responsible for overseeing third-party data transfer vendors and operations; and (iv) [c]ontinue to provide for the next five (5) years annual security awareness training for Kroger employees involved with customer and employee data sharing and data transfer activities, to cover industry best practices for data security and privacy."

*Id.* Finally, for five years after final approval of the Settlement, Kroger will continue to monitor the dark web for indications of fraudulent activity with respect to data of Kroger customers and current and former employees in connection with the FTA Data Breach. *Id.*

1

2

### 5.     The Settlement's Value to Settlement Class Members

The value of the Settlement is significant. The cash fund value of the Settlement is $5,000,000. This does not include the value of the Settlement's prospective relief or the retail value of the CMIS claimed by Participating Settlement Class Members.

### D.     Plan of Distribution

Subject to the Court's approval, the Settlement Administrator ("Administrator") will apply the Net Settlement Fund to make all distributions necessary for an election of CMIS, Cash Fund Payments, and Documented Losses. The Administrator will first apply the Net Settlements Fund to pay for claimed CMIS and then to pay for any valid claims for Documented Loss. SA ¶ 76.a.

The amount of the Settlement Fund remaining after all payments for CMIS and Documents Loss Payments are applied (the "Post DC Net Settlement Fund"), will be applied to pay valid claims for Cash Fund Payments. *Id*. ¶ 76(a)-(b). The amount of each Cash Fund Payment shall be calculated by dividing the Post DC Net Settlement Fund by double the number of valid claims submitted by California residents added to the number of valid claims submitted by non-California residents to determine a "Initial Cash Amount." *Id*. The Cash Fund Payment amount to non-California residents with Approved Claims will be equal to the Initial Cash Amount, and the Cash Fund Payment to California residents with Approved Claims will equal twice the Initial Cash Amount. *Id*.

Settlement Class Claimants will have the option to receive any Settlement Payment available to them pursuant to the terms of the Settlement Agreement via digital PayPal, Venmo, and or digital payment Card. *Id*. ¶ 72; Azari Decl. ¶ 23. In the event Class Members do not exercise an electronic payment option, they will receive their Settlement Payment via a physical check, which they will have 60 days following distribution to deposit or cash. SA ¶ 77. This plan is similar to past distributions of settlements negotiated and recommended by proposed Class Counsel, and approved by Courts. Wolfson Decl. ¶ 25; Barnow Decl. ¶ 31.

- 11 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.    Residual

Importantly, the Settlement Fund is non-reversionary. To the extent any monies remain in the Net Settlement Fund more than 150 days after the distribution of Settlement Payments, a subsequent Settlement Payment will be evenly made to all Claimants with Approved Claims who cashed or deposited the initial payment they received, assuming such payment is over $3.00. SA ¶ 78. In the event such a payment is less than $3.00 for each Approved Claim for cash, then the remaining funds will be used to extend the two-year term of the CMIS for as long as possible for all Claimants who selected CMIS. *Id.* Any amount remaining thereafter will be paid to the proposed Non-Profit Residual Recipient: Rose Foundation's Consumer Privacy Rights Fund ("Rose Foundation"), a 26 U.S.C. 501(c)(3) non-profit organization. *Id.* ¶¶ 25, 78. The Rose Foundation's efforts are directly related to the subject matter of this action. Wolfson Decl. ¶ 27. Proposed Class Counsel have no relationship with the Rose Foundation. *Id.*; Barnow Decl. ¶ 26.

### F.    Notice to Class

Pursuant to Rule 23(e), the Administrator will provide Class Members with the Summary Notice via email for any Class Member for whom an email address is available, and via U.S. mail in post card form for all other Class Members for whom a physical mailing address is available. SA ¶ 85; Azari Decl. ¶¶ 13-15. If an email notice is returned undeliverable, the Administrator shall attempt two other email executions; if unsuccessful, the Administrator will send a post card Summary Notice via U.S. mail to the extent a current mailing address is available. SA ¶ 85.c.; Azari Decl. ¶¶ 14-15. For Summary Notices returned as undeliverable via U.S. mail, the Administrator will re-mail the notice to any forwarding address identified on the return mail. SA ¶ 85.d.; Azari Decl. ¶ 15.

For recipients of notice via email who have not submitted Claim Forms, the Administrator will periodically transmit reminder emails of the opportunity to submit a Claim Form prior to the Claims Deadline. SA ¶ 88; Azari Decl. ¶ 16.

The Administrator also will design and conduct an internet digital advertising publication notice program, which will continue through the Claims Deadline. SA ¶ 86; Azari Decl. ¶¶ 17-18.

- 12 -

Furthermore, the Summary Notice will be posted on Kroger's internal intranet called "The Feed," to which current Kroger associates have access and which they frequently view for company updates and shift schedules. SA ¶ 86; Azari Decl. ¶ 18.

The Administrator also will create and maintain a Settlement Website that containing all relevant information and documents regarding the Settlement (including the Long Form Notice, the Claim Form, the Settlement Agreement, Preliminary Approval documents, and the operative Complaint), through which Class Members can submit electronic Claims Forms and Requests for Exclusion. SA ¶ 89; Azari Decl. ¶ 19. The Settlement Website will also contain a toll-free telephone number and mailing address through which Class Members can contact the Administrator. SA ¶ 89; Azari Decl. ¶ 20. The language of all Notice Forms (Summary Notice, Long Form Notice, Claim Form, etc.) is easily understandable and takes into account the education level or language needs of the proposed Class Members. Azari Decl. ¶¶ 21, 24-25.

### G.      Proposed Class Representative Service Awards

Since the litigation was commenced, Plaintiffs have been dedicated and active participants. They investigated the matter prior to and after retaining counsel, participated in the plaintiff vetting process implemented by their counsel, reviewed and approved the initial complaints and the operative FAC, kept in close contact with counsel to monitor the progress of the litigation, and reviewed and communicated with their counsel regarding the Settlement. Wolfson Decl. ¶ 45. Each Plaintiff put their name and reputation on the line for the sake of the Class, and the recovery would not have been possible without their efforts.

In view of these efforts, on behalf of Plaintiffs, counsel will separately petition the Court for approval of service awards in the amount of $1,500 for each of the three Plaintiffs. SA ¶ 96. This amount is consistent with those approved in other data breach class action settlements.

### H.      Attorneys' Fees and Expenses

As part of the Settlement, Plaintiffs' counsel will separately file a motion for an award of reasonable attorneys' fees and reimbursement of litigation costs and expenses. SA ¶¶ 99-101. Notably, there is no "free sailing" clause in the Settlement, and any amount sought for payment of

- 13 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

attorneys' fees will be reasonable, and consistent with the Ninth Circuit's 25% "benchmark" percentage for such awards. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). Proposed Class Counsel have expended approximately $500,763 in lodestar collectively and incurred $22,888.10 in expenses. Wolfson Decl. ¶ 47; Barnow Decl. ¶ 51. Proposed Class Counsel are not yet certain whether, or in what amount, a multiplier will be sought as they expect a number of additional hours to be expended in this matter prior to the filing of a motion for fees and expenses. In no event will proposed Class Counsel seek more than 25% of the Settlement Fund. No portion of any awarded fees will revert to Kroger. Proposed Class Counsel intend to seek reimbursement of all expenses incurred to date. Any approved Fee Award and Costs will be paid by Kroger out of the Settlement Fund. SA ¶ 99. The Settlement is not conditioned upon the Court's approval of the Fee Award and Costs, or the proposed Service Awards. *Id.* ¶ 101.

**I.      The Settlement Administrator**

The Parties propose that Epiq—an experienced and reputable national class action administrator—serve as Administrator to provide notice; administer and make determinations regarding claim forms; process settlement payments; make distributions; and provide other services necessary to implement the Settlement. SA ¶ 42; *see generally* Azari Decl. The costs of the Administrator will be paid by Kroger out of the Settlement Fund.

The Parties selected Epiq as the Administrator following a competitive bidding process led by proposed Class Counsel to identify the most efficient and lowest cost Settlement administration option for the benefit of Class Members. Wolfson Decl. ¶ 23. Proposed Class Counsel considered four different proposals from other potential administrators. With each of the potential settlement administrators, proposed Class Counsel discussed the notice and distribution plans agreed to in the Settlement. *Id.* Proposed Class Counsel—each of whom have litigated hundreds of class actions to settlement since the 1990s—previously have worked with Epiq on different matters. Wolfson Decl. ¶ 23; Barnow Decl. ¶ 22. They also have worked with the other nationally recognized administrators who submitted proposals for this Settlement. The estimated $740,948 to $827,299 cost for settlement administration is reasonable. Wolfson Decl. ¶ 23.

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.     PRELIMINARY APPROVAL IS APPROPRIATE

### A.     The Rule 23 Requirements for Class Certification are Met

Parties seeking class certification for settlement purposes must satisfy the requirements of Fed. R. Civ. P. 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'" *Sandoval v. Roadlink USA Pac., Inc.*, No. EDCV 10-00973, 2011 WL 5443777, at *2 (C.D. Cal. Oct. 9, 2011) (quoting *Amchem*, 521 U.S. at 621). At the preliminary approval stage, "if a class has not [yet] been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23, Adv. Comm. Notes to 2018 Amendment. All the requirements of Rule 23(a) must be met, and "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

### 1.     Rule 23(a) Is Satisfied

### i.     The Class Is Sufficiently Numerous

There are approximately 3.82 million geographically dispersed Settlement Class Members. Wolfson Decl. ¶ 36. The Rule 23(a)(1) numerosity requirement is satisfied.

### ii.     There Are Common Questions of Law and Fact

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (characterizing commonality as a "limited burden," which "only requires a single significant question of law or fact").

Here, numerous common issues of law and fact affect the Class uniformly, including: the nature of Kroger's data security practices, whether Kroger knew or should have known that Accellion's FTA was unsecure, whether Kroger owed duties of care to Class Members to safeguard their PII, and whether Kroger breached those duties. Resolution of these and other common inquiries can be achieved through to common evidence that does not vary from Class Member to Class Member. Commonality is satisfied.

- 15 -

1

2

### iii.     The Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that the Class Representatives' claims be typical of those of the Class. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).

Here, the claims of the named Plaintiffs are typical of the claims of the Settlement Class. Jaramey Stobbe is a Kroger employee, and Ricky Cochran and Alain Berrebi are customers; the Class Members are Kroger employees and customers. Plaintiffs' and Class Members' claims arise from the same nucleus of facts relating to the FTA Data Breach, pertain to a common defendant Kroger, and are based on the same legal theories. Plaintiffs thus satisfy the Rule 23(a)(3) typicality requirement.

### iv.     Class Representatives and Proposed Class Counsel Adequately Represent Class Members

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class," which requires that the named plaintiffs (1) not have conflicts of interest with the proposed Class; and (2) be represented by qualified and competent counsel. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018).

Plaintiffs and proposed Class Counsel are adequate. First, the proposed Class Representatives have demonstrated that they are well-suited to represent the Settlement Class, have actively participated in the litigation, and will continue to do so. Wolfson Decl. ¶ 44. They do not have any conflicts of interest with the absent Class Members, as their claims are coextensive with those of the Class Members. *Id.*; *Kent v. Hewlett-Packard Co.*, No. 5:09-CV-05341, 2011 WL 4403717, at *1 (N.D. Cal. Sept. 20, 2011) (finding class representatives adequate where their claims coextensive were with those of absent class members, and they had no conflicts).

Second, proposed Class Counsel are highly qualified and experienced in class action and

- 16 -

complex litigation, with both firms having expertise and extensive experience in data breach and data privacy class actions. Wolfson Decl. ¶¶ 48-63 and Ex. 1; Barnow Decl. ¶¶ 38-50 and Ex. 2. Proposed Class Counsel have been dedicated to the prosecution of this action and will remain so through final approval. Among other things, they identified and investigated the claims in this lawsuit and the underlying facts, spoke with numerous Class Members, engaged in mediation with Kroger, and successfully negotiated this Settlement. Wolfson Decl. ¶ 17; Barnow Decl. ¶¶ 13-14, 17, 36; *see also In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (a court evaluating adequacy of representation may examine "the attorneys' professional qualifications, skill, experience, and resources . . . [and] the attorneys' demonstrated performance in the suit itself"); *Alvarez v. Sirius XM Radio Inc.*, No. CV 18-8605, 2020 WL 7314793, at *8 (C.D. Cal. July 15, 2020) (adequacy of counsel satisfied where class was "represented by Class Counsel who are experienced in class action litigation"). The adequacy requirement is satisfied.

### 2.      Rule 23(b)(3) is Satisfied

Rule 23(b)(3) requires that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members of the class," and (2) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied.

### i.      Common Issues of Law and Fact Predominate Over Any Potential Individual Questions

The Rule 23(b)(3) predominance element requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Here, Plaintiffs' claims depend on whether Kroger had reasonable data security measures in place to protect Plaintiffs' and Class Members' PII, and whether Kroger could have prevented unauthorized exposure of Plaintiffs' PII or mitigated its effects with more adequate third-party risk management practices. These questions can be resolved using the same evidence for all Class Members, including Kroger's internal documents, testimony of its employees, and expert analysis. *Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*, No. 3:16-CV-05486, 2018 WL

- 17 -

8949777, at *5 (N.D. Cal. Oct. 15, 2018) ("Predominance is satisfied because the overarching common question . . . can be resolved using the same evidence for all class members and is exactly the kind of predominant common issue that makes certification appropriate.").

Indeed, the FTA Data Breach affected all Class Members in a uniform fashion, compromising the similar types of PII for Plaintiffs and the Settlement Class. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 312 (N.D. Cal. 2018) (". . . Plaintiffs' case for liability depends, first and foremost, on whether Anthem used reasonable data security to protect Plaintiffs' personal information. . . . That question can be resolved using the same evidence for all Class Members because their personal information was all stored on the same Anthem data warehouse that was the subject of the breach.").

The issues presented are susceptible to common proof because they focus on Kroger's class-wide data security policies and practices, and thus are the type of predominant questions that make a class-wide adjudication worthwhile. *Id.*; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) . . . .'" (citation omitted)). Predominance is satisfied.

### ii.     A Class Action is the Superior Method to Fairly and Efficiently Adjudicate the Matter

Rule 23(b)(3) requires a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy," and sets forth the following factors:

> The matters pertinent to the findings include: (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Where, as here, a court is deciding the certification question in the proposed class action settlement context, it need not consider manageability issues because "the proposal is that there be no trial," and hence manageability considerations are no hurdle to certification for purposes of

- 18 -

settlement. *Amchem*, 521 U.S. at 620.

A class action is the only reasonable method to fairly and efficiently adjudicate Class Members' claims against Kroger. *See, e.g.*, *Phillips Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually . . . [In such a case,] most of the plaintiffs would have no realistic day in court if a class action were not available."). Resolution of the predominant issues of fact and law through individual actions is impracticable: the amount in dispute for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Just Film, Inc. v. Buono,* 847 F.3d 1108, 1123 (9th Cir. 2017).

The class device is the superior method of adjudicating consumer claims against Kroger arising from the FTA Data Breach because it promotes greater efficiency, and no realistic alternative exists. Courts routinely recognize this in other data breach cases where class-wide settlements have been approved. *See, e.g.*, *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019); *In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019).

**B.      The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class Members, and Should be Preliminarily Approved**

The 2018 revisions to Rule 23 confirm the need for a detailed analysis regarding the fairness of a proposed class settlement. "The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). Accordingly, a district court may approve a settlement agreement "after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P. 23(e)(2).

In making this decision, Rule 23(e)(2) now clarifies that district courts must consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

- 19 -

(C) the relief provided for the class is adequate, taking into account:

 (i) the costs, risks, and delay of trial and appeal;

 (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

 (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

 (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Thus, Rule 23(e) now reflects the factors that courts in this Circuit already considered for settlement approval: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the Class Members to the proposed settlement." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 317 (N.D. Cal. 2018) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).

"Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 946.

At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval." *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009). Ultimately, "[s]trong judicial policy favors settlements." *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 576 (9th Cir. 2003) (ellipses and quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

- 20 -

1

2

### 1.      The Strength of Plaintiffs' Case and Possible Monetary Remedies

Plaintiffs believe they have a strong case for liability against Kroger. The operative FAC details the shortcomings in Kroger's data security measures. ECF No. 27 ¶¶ 24, 89-90. Plaintiffs allege that Accellion's FTA product at the heart of the FTA Data Breach was an unsecured, legacy, end-of-life product. *Id.* ¶¶ 28-29. Plaintiffs also allege that Accellion provided notice to its clients, like Kroger, that a newer and more secure Accellion file transfer product called Kiteworks was available, and that clients should migrate to this product. *Id.* ¶¶ 26-27. Plaintiffs allege that Kroger did not promptly do so. *Id.* ¶ 30. Plaintiffs also allege that Kroger entrusted customer and employee PII to Accellion under a duty to make sure that the PII was secure. *Id.* ¶¶ 24, 89-90.

Plaintiffs also believe that they would be able to recover damages on behalf of the Class. The range of potential outcomes is large, however. The scope of damages depends in large part on the scope of class certification, whether various theories of damages would be accepted by the Court (i.e., Benefit of the Bargain and Loss of Value of PII theories), and which causes of action survive. Nonetheless, if applied across all potential class members equally, Plaintiffs' most conservative measure (based on black-market rates of at least $5 per individual for social security numbers[4]) would yield a figure of $19,126,000, while more expansive measure (based on at least $15 of monthly credit monitoring costs[5]) would yield $57,378,000, and the most expansive measure (based on back market rates of $70 for health care data[6]) would yield $267,750,000. Assuming the statutory damages available to California residents, nominal damages to those individuals would total to $150 million.

These amounts are not certain, however, and the case is subject to numerous risks (*see, infra*, Sec. V.B.2.). Plaintiffs believe that the legal theories behind such larger damage figures are meritorious, but also recognize that they are untested. As a practical matter, Plaintiffs' counsel recognize that taking such large numbers to a jury presents substantial strategic risks. Even a

---

[4]     *See Premera, supra,* ECF No. 156, p. 20 of 24, Motion for Class Certification.

[5]     *See* Siciliano Decl. ¶ 7.

[6]     *See, Premera, supra,* ECF No. 156, p. 20 of 24, Motion for Class Certification.

number in the mid-hundreds of millions potentially risks offending a jury and leading to a nominal award—or no monetary award at all. *See e.g. Corcoran et al. v. CVS Health Corporation*, No. 4:15-CV-03504, ECF No. 611 (N.D. Cal. June 24, 2021) (unanimous defense verdict where Plaintiffs' counsel urged jury to award 6.3 million CVS Pharmacy customers $121 million in generic drug price overcharge suit). Moreover, once damages are determined, the jury may be asked to apportion damages between Kroger and Accellion, thus further reducing any award as to Kroger.

### 2. The Risk, Expense, Complexity, and Potential Class Recovery

This factor overwhelmingly weighs in favor of preliminary approval. As stated above, while Plaintiffs believe their case is a strong one, there is substantial risk. Data breach cases are, by nature, especially risky and expensive. Such cases also are innately complex. *See, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 WL 256132, at *32-33 (N.D. Ga. Mar. 17, 2020) (recognizing the complexity and novelty of issues in data breach class actions). This case is no exception to that rule. It involves nearly four million Settlement Class Members, complicated and technical facts, a well-funded and motivated defendant, and numerous contested issues on class certification and substantive defenses.

There are numerous substantial hurdles that Plaintiffs would have to overcome before the Court might find a trial appropriate. First, given the early stage of the litigation, the legal sufficiency of Plaintiffs' pleading was not tested by a motion to dismiss, including Article III standing. Establishing a cognizable injury tied to Kroger's conduct (as opposed to, for instance, another data breach or some other cause) can present challenges. *See, e.g., Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) (holding that, although plaintiffs established injury-in-fact for standing purposes, they failed to allege cognizable damages in a data breach case); *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614 (9th Cir. 2021) (affirming dismissal of data breach class action for failure to allege cognizable damages).

Data breach cases, particularly, face substantial hurdles in surviving even past the pleading stage and are among the most risky and uncertain of all class action litigation. *See, e.g., Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25,

- 22 -

2010) (collecting cases). Kroger likely would argue that certification is not appropriate for numerous reasons, including because the compromised Class Member PII is not uniform among class members. Kroger also likely would argue that it is not liable because it retained Accellion in the first place (a supposedly secure third-party data transferor with a file transfer service), was never informed by Accellion that the FTA product was not secure, and even purchased Kiteworks and was in the process migrating to that product. *See, supra*, Section V.B.1. Kroger likely would argue that Accellion is solely at fault for the FTA Data Breach, and thus that Kroger is not liable at all.

Were litigation to proceed, there would be numerous expert reports and costly depositions, which would present significant expenses. It is also not certain that the Court would approve Plaintiffs' damages theories. As in any data breach class action, establishing causation and damages on a class-wide basis is largely unchartered territory and full of uncertainty.

The California statutory claims also face significant risk of dismissal on the pleadings or an unfavorable disposition at summary judgment. Both statutes are relatively new and remain largely untested in motion to dismiss, summary judgment, and class certification proceedings.

For example, California courts have ruled that under the CMIA, a plaintiff may not recover statutory damages due to mere theft of medical information; rather, plaintiffs must allege that an unauthorized person actually viewed the confidential information. *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1550 (2014); *see also Regents of University of California v. Superior Court*, 220 Cal. App. 4th 549 (2013) (holding that plaintiff did not state claim under CMIA because plaintiff had not alleged that any unauthorized person actually viewed the medical records allegedly stolen). Kroger would likely argue that criminals did not actually view the stolen PII, and it would further rely heavily on its ransom payment and efforts to secure the stolen PII to undercut the legal sufficiency of this claim.

Other decisions concerning the CMIA create potential risks for the claim. For example, Kroger would argue that Plaintiffs have not alleged a release of, and that the breach did not compromise, medical history and treatment information—allegations that Kroger would argue are required for CMIA liability. *See Eisenhower Medical Center v. Superior Court (Malanche)*, No.

E058378, 2014 WL 2115216, at *4 (Cal. Ct. App. May 21, 2014) (holding that "under the CMIA a prohibited release . . . must also include information relating to medical history . . . or treatment of the individual."). Kroger may also assert that it is not a covered entity under the CMIA, and take the position that under Cal. Civ. Code § 56.05(m), it does not meet the definition of a "provider of health care."

The CCPA claim also bears significant risks. This law became effective only on January 1, 2020, and there is still very limited decisional law interpreting this statute and analyzing private causes of action brought pursuant to it. Were this litigation to continue, Kroger would attack the merits of this claim. For example, the CCPA's private cause of action provision, Cal. Civ. Code § 1798.150(a)(1), states that liability may be found only where the unauthorized disclosure of protected information occurs "as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices. . . ." *Id.* Kroger would likely dispute that it violated any duty, and would argue that it did maintain reasonable data security measures.

Kroger may also raise challenges to the CCPA claim on standing grounds for Class Members. *See* Cal. Civ. Code § 1798.150(a)(1) (providing for private cause of action only for individuals who had information under § 1798.81.5(d)(1)(A) impacted in combination with their name); *see also Rahman v. Marriott Int'l, Inc*., No. SACV2000654, 2021 WL 346421, at *3 (C.D. Cal. Jan. 12, 2021) (dismissing CCPA claim for lack of standing where plaintiff's more sensitive information, such as credit card numbers, SSN, or passports, was not stolen). Kroger further would dispute standing and injury under the CCPA based upon its claimed cure of the alleged violations. *See, supra*, Sec. III.A.

Finally, the CCPA explicitly exempts "medical information" and "providers of health care" that are otherwise covered by the CMIA. *See* Cal. Civ. Code § 1798.145(c)(1)(A)-(B). If litigation were to continue, Kroger would argue that individuals whose medical, health, or pharmacy information was exposed in the FTA Data Breach cannot recover under the CCPA, and that those individuals can only seek recovery under the CMIA. The Settlement avoids the risk of non-recovery under the CCPA, especially in view of the risks inherent to the CMIA claim (discussed *supra*).

- 24 -

The Settlement is a prudent course in view of these high risks. Given that all Class Members will be eligible to elect CMIS or cash payments, the Settlement provides benefits that address all potential harms of a data breach without the substantial risk of continued litigation, which includes the risk of dismissal or judgement against Plaintiffs.

### 3.      The Risk of Maintaining Class Status Through Trial

Plaintiffs' case is still in the pleading stage, and the Parties have not briefed class certification in this action. Class certification presents substantial risk, particularly given that different types of information were affected for different class members. Data breach law is developing so that even if Plaintiffs obtained class certification, there is no guarantee that the class action status would be maintained. Kroger would likely seek a Rule 23(f) appeal of any decision by the Court granting class certification, resulting in additional delay to Class Members. The significant risk of obtaining and maintaining class certification in this case supports preliminary approval.

### 4.      The Amount Offered in Settlement Is Fair

The $5 million non-reversionary Settlement Fund is an excellent result for the Class. With this fund, all Class Members will be eligible for a Settlement Payment in the form of distribution for the CMIS, Documented Loss Payment, or a Cash Fund Payment. SA ¶¶ 60, 71. The Settlement Fund will be applied to pay all Administrative Expenses, Notice Expenses, the taxes to the Settlement Fund, any Service Awards, and any payment of a Fee Award and Costs. *Id*. ¶ 63. Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be distributed in a subsequent Settlement Payment to Class Members. *Id*. ¶ 78.

Based on the size of the breach and per-capita figures, the Settlement presents a robust relief package and valuable outcome for the Class compared to other recent data breach class action settlements. *See, e.g., In re The Home Depot, Inc. Customer Data Sec. Breach Litig*., No. 1:14-MD-02583, 2016 WL 6902351, at *7 (N.D. Ga. Aug. 23, 2016) and ECF No. 181-2 ¶¶ 22, 38 ($13 million settlement for approximately 40 million class members); *In re Target Corp. Customer Data Sec. Breach Litig*., MDL No. 14-2522, 2017 WL 2178306, at *1-2 (D. Minn. May 17, 2017) ($10

- 25 -

million dollar settlement for nearly 100 million class members); *In re Linkedin User Priv. Litig.*, 309 F.R.D. 573, 582 (N.D. Cal. 2015) (settlement fund of $1.25 million for claims related to approximately 6.4 million LinkedIn users' stolen account passwords). Furthermore, Plaintiffs successfully obtained substantive and meaningful injunctive relief as part of this Settlement. *See e.g., Campbell v. Facebook*, *Inc.*, 951 F.3d 1106, 1114 (9th Cir. 2020) (inclusion of "enhanced disclosures and practices changes" in settlement agreement). The chart below demonstrates the quality of this Settlement as compared to other data breach settlements:

| Case Title | No. of Class Members | Settlement Fund | Amount Per Class Member | Credit Monitoring |
|---|---|---|---|---|
| *Cochran et al. v. The Kroger Co.* | **3.82M** | **$5M** | **$1.31** | **2 years** |
| *In re Target Corp. Customer Data Breach Security Litigation* | 97.5M | $10M | $0.10 | Documented Cost Reimbursement |
| *In re LinkedIn User Privacy Litig.* | 6.4M | $1.25M | $0.20 | N/A |
| *In re The Home Depot Inc. Customer Data Security Breach Litig.* | 40M | $13M | $0.33 | 18 Months |
| *In re Yahoo! Inc. Customer Data Breach Litigation* | 194M | $117.5M | $0.61 | 2 years |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.* | 4.5M | $2M | $0.44 | 2 years |
| *Atkinson, et al. v. Minted, Inc.* | 4.1M | $5M | $1.22 | 2 years |
| *In re Experian Data Breach Litigation* | 16M | $22M | $1.37 | 2 years |
| *In re Anthem, Inc. Data Breach Litigation* | 79.2M | $115M | $1.45 | 2 years |
| *In re Equifax Inc. Data Security Breach Litigation* | > 147M | $380.5M | $2.59 | 4 years |
| *In re Premera Blue Cross Customer Data Security Breach Litigation* | 8.86M | $32M | $3.61 | 2 years |
| *Winstead v. ComplyRight, Inc.* | 665,689 | $3.025M | $4.54 | 2 years |

- 26 -

Wolfson Decl. ¶ 40. The Settlement amount strongly supports preliminary approval.

**5.      The Proposed Method of Distribution Is Highly Effective**

Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*, Advisory Comm. Note to 2018 amendment.

To file a claim, Settlement Class Members need only complete a Claim Form (which is in plain language and straightforward to complete) and submit it along with documents supporting their claimed losses. SA ¶¶ 71(c), 81 and Ex. A; Azari Decl. ¶ 21. Claim Forms may be submitted electronically or in hard copy. SA ¶ 81. All claims will be processed by Epiq, an experienced and nationally recognized class action administration firm. *Id.* ¶ 81(b); Azari Decl. ¶ 4. Epiq plans to assign specific case numbers to Settlement Class Members. Azari Decl. ¶ 13. The methods of distributing relief to Settlement Class Members includes both digital and physical check avenues. *Id.* ¶ 23.

Following consultation with the Administrator and based upon Class Counsel's previous experience in and knowledge of similar cases, Class Counsel expect the claims rate in this Settlement to be between 1-3%. Barnow Decl. ¶ 24; Wolfson Decl. ¶ 25; Azari Decl. ¶ 27. The claims rates in previous data breach settlement support this conclusion:

| Case Title | Approx. Class Size | No. of Claims | Claims Rate |
|---|---|---|---|
| *Gordon, et al. v. Chipotle Mexican Grill, Inc.*, No. 1:17-cv-01415 (D. Colo.), ECF 103 at 1 & ECF 124 at ¶ 13 | 10,000,000 | 6,354 | < 0.1% |
| *In re Target Corp. Customer Data Security Breach Litigation*, MDL No. 14-2522 (D. Minn.), ECF 615 at ¶¶ 4, 14 | 97,447,983 | 225,856 | ~0.2% |
| *In re The Home Depot Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 at 25 & ECF 245-1 at ¶ 3 | 40,000,000 | 127,527 | ~0.3% |

- 27 -

| | | | |
|---|---|---|---|
| *Corona v. Sony Pictures Entertainment, Inc.*, No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 at 11 n.8 & ECF 164 at 2 | 435,000 | 3,127 | ~0.7% |
| *In re LinkedIn User Privacy Litig.*, No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 at 2 & ECF 145-2 at ¶ 12 | 6,400,000 | 47,336 | ~0.7% |
| *In re Banner Health Data Breach Litigation*, No. 2:16-cv-2696 (D. Ariz.), ECF 170 at 1, and ECF 195-3 at ¶ 12 | 2,900,000 | 39,091 | ~1.3% |
| *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617-LHK (N.D. Cal.), ECF 1007 at 4 & ECF 1007-6 at ¶ 2 | 79,200,000 | 1,380,000 | ~1.7% |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.*, BC589243 (Cal. Super. Ct.), Wolfson Decl. ¶ 56. | 4,500,000 | 108,736 | ~2.4% |
| *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-JLS-DFM (C.D. Cal.), ECF 286-1 at 20 & ECF 309-3 at ¶ 8. | 14,931,074 | 436,006 | ~2.9% |
| *Sheth v. Washington State University*, No. 3:17-cv-05511 (W.D. Wash.) | 992,327 | 37,712 | ~3.8% |
| *Winstead v. ComplyRight, Inc.*, No. 1:18-cv-4990 (N.D. Ill.), Barnow Decl. ¶ 31. | 665,680 | 28,073 | ~4.2% |
| *In re Premera Blue Cross Customer Data Security Breach Litigation*, No. 3:15-md-2633 (D. Or.), ECF 273 at 12-13 & ECF 301 at ¶ 13 | 8,855,764 | 803,710 | ~9.1% |
| *In re Equifax Inc. Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), ECF 739-1 at 20 & ECF 900-4 at ¶ 5 | 147,000,000 | 15,000,000 | ~10.2% |

### 6. The Extent of Discovery Completed and the Stage of the Proceedings

While this matter is still in its early stages, Plaintiffs have diligently developed the facts and legal claims in this case. Plaintiffs conducted confirmatory discovery to establish, *inter alia*, facts relevant to the breach and Kroger's liability, Kroger's reaction to and actions after the breach, and class size. Wolfson Decl. ¶¶ 28-38; Barnow Decl. ¶ 29(a)-(j). Plaintiffs and their counsel have stayed abreast of all material developments involving the FTA Data Breach, including those impacting Kroger. Wolfson Decl. ¶ 13; Barnow Decl. ¶ 13. Counsel gathered the press releases and statements concerning the FTA Data Breach, reviewed the information Kroger has provided on its website about the breach (*see* https://www.kroger.com/i/accellion-incident (last visited June 30, 2021), reviewed Kroger's data breach notification letters, reviewed the Mandiant forensics report

(*see, supra*, n.3), and reviewed numerous  news stories and other publicly-available sources of information relating to the FTA Data Breach, including its impact on Kroger. Wolfson Decl. ¶ 13; Barnow Decl. ¶ 13.

The Parties engaged in informal discovery. As part of the negotiations and Settlement, the Parties engaged in confirmatory discovery to not only verify the relevant facts, but also the fairness of the Settlement. Wolfson Decl. ¶¶ 28-38; Barnow Decl. ¶ 29(a)-(j). Proposed Class Counsel's knowledge of facts of this case and of the practice area more broadly informed Plaintiffs' clear view of the strengths and weaknesses of the case, the decision to go to mediation with Kroger, and the decision to recommend that the Court grant preliminary approval to the Settlement. Wolfson Decl. ¶ 43; Barnow Decl. ¶¶ 34.

### 7.     The Experience and Views of Counsel

Proposed Class Counsel include attorneys who have substantial experience in complex class action litigation, including in data breach and data privacy cases. Wolfson Decl. ¶¶ 48-63 & Ex. 1; Barnow Decl. ¶¶ 38-50 & Ex 2. For example, Ms. Wolfson has decades of experience in privacy litigation, serves as co-lead counsel in the ongoing Zoom, Ring, and Google Location History privacy cases, and served as co-lead counsel both in the *Premera* and *Experian* data breach class actions, among numerous others. Wolfson Decl. ¶¶ 48-63. Ben Barnow is nationally recognized for his experience in leading some of the nation's largest consumer class actions and has been recognized as a *Titan of the Plaintiffs Bar*.[7] As a court-appointed lead counsel or equivalent designation, he has successfully led over forty major class actions (including MDLs) where class-wide recoveries were achieved, resulting in benefits valued in excess of five billion dollars being made available to class members. This includes leading eight noteworthy privacy class actions where class settlements were achieved, including, *inter alia*, *In Re: Sony Gaming Networks and Customer Data Security Breach Litigation*, MDL 2258, *In Re: TJX Retail Security Breach Litigation*, MDL No. 1838, *In Re: Countrywide Fin. Corp. Customer Data Security Breach*

---

[7]     *See* Sindhu Sundar, *Titan of the Plaintiffs Bar: Ben Barnow,* Law360 (Oct. 8, 2014, 7:40 PM), www.law360.com/articles/585655/titan-of-the-plaintiffs-bar-ben-barnow.

*Litigation,* MDL No. 1998, *Lockwood v. Certegy Check Services*, *Inc.*, 07-cv-01434 (M.D. Fla.)**,** *Rowe v. Unicare Life and Health Insurance Co.*, 2009cv2286 (N.D. Ill.)**,** *Orr v. InterContinental Hotels Group, PLC.*, 17-cv-1622 (N.D. Ga.), *In re: Zappos.com Inc. Customer Data Security Breach Litigation*, 12-cv-325 (D. Nev.) and *Winstead v. ComplyRight,* No. 1:18-cv-4990 (N.D. Ill.). Barnow Decl. ¶¶ 38-50 & Ex. 2.

Proposed Class Counsel fully endorse the Settlement as fair, reasonable, and adequate to the Class, and do so without reservation. Wolfson Decl. ¶¶ 39, 45; Barnow Decl. ¶¶ 7, 50.

### 8.    The Presence of a Governmental Participant

Although Kroger reports having cooperated with law enforcement in the wake of the FTA Data Breach, no governmental agency is involved in this litigation. The Attorney General of the United States and Attorneys General of each State will be notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections. Azari Decl. ¶ 28.

### 9.    The Reaction of Class Members to the Proposed Settlement

The Class has yet to be notified of the Settlement and given an opportunity to object, so it is premature to assess this factor. Before the final approval hearing, the Court will receive and be able to review all objections or other comments received from Class Members, along with a full accounting of all opt-out requests.

### 10.    The Settlement Is the Product of Arm's-Length Negotiations that Were Free of Collusion

The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d at 946-47.

Plaintiffs achieved the Settlement in contested litigation and through arm's-length negotiations. Plaintiffs undertook substantial investigation of the underlying facts, causes of action, and potential defenses to those claims. Wolfson Decl. ¶¶ 2, 13, 28-38.

When settlement negotiations began, Plaintiffs and their counsel had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision

- 30 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

regarding the reasonableness of a potential settlement. The Parties engaged in extensive arm's length negotiations, including a full-day mediation session before a mutually agreed upon mediator, the Hon. Jay C. Gandhi (Ret.) on May 13, 2021. *Id*. ¶ 19.

Judge Gandhi, a highly respected and experienced mediator, has extensive experience in class action litigation, both from his time as a magistrate judge in the Central District of California and as a result of mediating many class actions, including multiple data breach cases where a settlement was reached and subsequently approved.[8] His involvement here further confirms the absence of collusion. *G. F. v. Contra Costa Cnty*., No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

*Bluetooth* identified three "signs" of possible collusion: (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. *Bluetooth, supra,* 654 F.3d at 947.

None of the *Bluetooth* signs are present here. There is no "free sailing provision" and Class Counsel will not seek fees and expenses that exceed the 25% of the Fund benchmark set by *Bluetooth*. *Id.* at 942; SA ¶¶ 99-101; *see, supra,* Sec. IV.H. There is no reversion of the Settlement Fund (SA ¶ 62), but rather the Settlement makes every effort to distribute any Residual to the Class. *See id*. ¶ 78. Proposed Class Counsel will apply for fees from this non-reversionary Settlement Fund, so that there was every incentive to secure the largest fund possible.

There is no indication or existence of collusion or fraud in the settlement negotiations and the Settlement that is being presented to the Court.

---

[8]    *See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, 2019 WL 3410382, at *1 ("*Premera*") (D. Or. July 29, 2019); *In re Banner Health Data Breach Litigation*, No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019), ECF No. 170, at 6 (parties engaged in private mediation with Judge Gandhi).

- 31 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 11.     The Proposed Notice Plan is Appropriate

Rule 23 requires that prior to final approval, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Rule provides, "notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*.

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Wershba v. Apple Comput., Inc.*, 91 Cal. App. 4th 224, 252 (2001) ("As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members.").

The notice should provide sufficient information to allow Class Members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms. *Id.* at 251-52. "[N]otice is adequate if it may be understood by the average class member." *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171, 2016 WL 8578913, at *14 (C.D. Cal. Dec. 2, 2016) (quoting 4 Newberg on Class Actions § 11:53, at p. 167 (4th ed. 2013)).

The Notice Plan agreed to by the Parties and approved by the Administrator includes direct notice by emailing or mailing the Summary Notice to all Settlement Class Members, and reminder emails to those for whom email addresses are available. SA ¶¶ 85, 88; Azari Decl. ¶¶ 13-16. The Administrator will design and conduct an internet digital advertising publication notice program and Settlement Website, which will continue through the Claims Deadline. SA ¶ 86; Azari Decl.

- 32 -

¶¶ 17-18. Furthermore, the Summary Notice will be posted on Kroger's internal intranet called "The Feed," to which current Kroger associates have access and which they frequently view for company updates and shift schedules. SA ¶ 86.

The Long Form Notice is clear, precise, informative, and meets all the necessary standards, allowing Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the Settlement. It will include a clear description of the claims and the history of the litigation; a description of the Class; a description of the Settlement and the claims being released; the names of Class Counsel; a statement of the maximum amount of attorneys' fees that will be sought by Class Counsel; the amount Plaintiffs will seek for Service Awards; the Fairness Hearing date; a description of Class Members' opportunity to appear at the hearing; a statement of the procedures and deadlines for requesting exclusion and filing objections to the Settlement; and the manner in which to obtain further information. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); Manual for Complex Litigation § 30.212 (4th ed. 2004) ("MCL") (Rule 23(e) notice should provide a summary of the litigation and the settlement to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings).

The proposed Notice Plan represents the best notice practicable. It was reviewed and analyzed to ensure it meets the requisite due process requirements. Azari Decl. ¶¶ 6, 26. Copies of all the notice documents are attached as exhibits to the Settlement Agreement; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know to make a claim, opt out, or object. Fed. R. Civ. P. 23(c)(2)(B); *see also* Azari Decl. ¶ 21. The Notice Plan is consistent with, and exceeds, other similar court-approved notice plans, the requirements of Fed. Civ. P. 23(c)(2)(B), and the Federal Judicial Center ("FJC") guidelines for adequate notice.

As there is no alternative method of notice that would be practicable here or more likely to notify Class Members, the proposed Notice plan constitutes the best practicable notice to Class Members and complies with the requirements of Due Process.

- 33 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 12. Appointment of Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts consider the following attributes: the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Settlement Class Counsel have extensive experience prosecuting complex consumer class action cases, and specifically data breach and data privacy cases. Wolfson Decl. ¶¶ 48-63 and Ex. 1; Barnow Decl. ¶¶ 38-50 & Ex. 2. As described above and in their supporting declarations and firm resumes, Proposed Counsel meet all Rule 23(g)(1)(A) factors.

Accordingly, the Court should appoint Ahdoot & Wolfson, PC, and Barnow and Associates, P.C., as Class Counsel.

## 13. Settlement Deadlines and Schedule for Final Approval

In connection with preliminary approval, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to the Settlement and filing papers in support of the Settlement. Plaintiffs propose the following schedule, which the parties believe will provide ample opportunity for Class Members to decide whether to request exclusion or object:

| EVENT | DATE |
|---|---|
| Notice Date (U.S. Mail and email) | Within 30 **Days** from the Preliminary Approval Order |
| Deadline to Submit Claim Forms | **90 Days** from the Notice Date |
| Deadline to Submit Motion for Attorneys' Fees, Costs and Incentive Awards | At Least **35 Days** Before the Objection Deadline |
| Deadline to Object and Comment to the Settlement | **75 Days** from the Notice Date |

- 34 -

| EVENT | DATE |
|---|---|
| Deadline to Submit Request for Exclusion | **75 Days** from the Notice Date |
| Final Fairness Hearing | To be Determined |

## VI.    CONCLUSION

Plaintiffs, Ricky Cochran, Alain Berrebi, and Jaramey Stobbe respectfully request that the Motion be granted and the Court enter an order: (1) certifying the proposed class for settlement; (2) preliminarily approving the proposed class action Settlement; (3) appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel; (4) appointing Epiq as the Settlement Administrator; (5) approving the proposed Class Notice Plan and related Settlement administration documents; and (6) approving the proposed class settlement administrative deadlines and procedures, including setting a final fairness hearing date, and approving the proposed procedures regarding objections, exclusions and submitting Claim Forms.

Dated: June 30, 2021                                    Respectfully submitted,

                                                        */s/ Tina Wolfson*
                                                        TINA WOLFSON (SBN 174806)
                                                        *twolfson@ahdootwolfson.com*
                                                        ROBERT AHDOOT (SBN 172098)
                                                        *rahdoot@ahdootwolfson.com*
                                                        THEODORE MAYA (SBN 223242)
                                                        *tmaya@ahdootwolfson.com*
                                                        **AHDOOT & WOLFSON, PC**
                                                        2600 W. Olive Avenue, Suite 500
                                                        Burbank, CA 91505-4521
                                                        Tel:  310.474.9111; Fax: 310.474.8585

                                                        BEN BARNOW (*pro hac vice*)
                                                        *b.barnow@barnowlaw.com*
                                                        ANTHONY L. PARKHILL (*pro hac vice*)
                                                        *aparkhill@barnowlaw.com*
                                                        **BARNOW AND ASSOCIATES, P.C.**
                                                        205 West Randolph Street, Suite 1630
                                                        Chicago, IL 60602
                                                        Tel: 312-621-2000; Fax: 312-641-5504

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087

Tel:  310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs and the Proposed Class*